

STEVEN S. ALM
United States Attorney
District of Hawaii

THOMAS MUEHLECK
Assistant U.S. Attorney
300 Ala Moana Blvd., Suite 6100
Honolulu, Hawaii 96850
Telephone: (808) 541-2850

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 02 2001

at ___ o'clock and ___ min. ___ M
WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| UNITED STATES OF AMERICA, | ) | CR. NO. 00-00184 (08) HG-BMK |
|---|---|---|
| Plaintiff, | ) | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS; CERTIFICATE OF SERVICE |
| v. | ) | |
| MONA HIIACA HUIHUI, (08), | ) | |
| Defendant. | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

### INTRODUCTION

The defendant challenges the electronic surveillance order used to intercept the defendant's telephone conversations, the search of the defendant's suitcase at the Las Vegas airport on March 30, 2000, which yielded two pounds of crystal methamphetamine and the search of the defendant's apartment at 2023 Date Street in Honolulu or or about May 4, 2000, which resulted in the seizure of drug paraphernalia. The defendant's motion is without merit.

**EXHIBIT 2**

## THE LAW

A district court must suppress evidence seized pursuant to a wiretap if the defendant can show the wiretap application contained intentionally or recklessly false information that was material to the finding of probable cause. United States v. Leon, 468 U.S. 897, 923 (1984).

The defendant may challenge the validity of the government's affidavit by making a substantial preliminary showing that a false statement was included in the warrant affidavit knowingly and intentionally or with reckless disregard for the truth. Franks v. Delaware, 438 U.S. 154, 170 (1978); United States v. Miller, 116 F.3d 641, 664 (2d Cir. 1997); United States v. Lefkowitz, 618 F.2d 1313, 1379 (9th Cir. 1980); United States v. Collins, 61 F.3d 1379, 1384 (9th Cir. 1995). Although the Supreme Court has not ruled on this issue, a number of Circuit Courts have also held that reckless omissions are also challengeable.[1] Allegations of negligence or innocent mistake are insufficient to warrant a Franks hearing. United States v. Miller, 753 F.2d 1475, 1478 (9th Cir. 1985).

If the challenged statement was necessary to support probable cause for the search, the court must hold an evidentiary hearing on the matter. If, however, probable cause still exists

---

[1] The Fifth, Eight and Ninth Circuits have extended Franks to include reckless omissions. United States v. Stanert, 762 F.2d 775, 781 (9th Cir. 1985).

2

once this statement is extracted from the warrant, there is no need to hold a <u>Franks</u> hearing. <u>Franks</u>, 438 U.S. at 171-72; <u>United States v. Meling</u>, 47 F.3d 1546, 1553 (9th Cir. 1995).

I.  <u>The Wiretap Applications Shows Necessity And Does Not Mislead The Court</u>

In determining whether the defendant should be granted a <u>Franks</u> hearing, the court must engage in a two-part inquiry. First, the court must ask whether the Drug Enforcement Administration (DEA), intentionally falsified or recklessly failed to verify any of the information in the wiretap application. If the defendant has made a substantial showing that the DEA falsified the wiretap application, the court must proceed to determine whether the falsities are material. The court must hold a <u>Franks</u> hearing only if the application, purged of its intentional or reckless falsities would not support a finding of probable cause. <u>United States v. Meling</u>, 47 F.3d 1546, 1553 (9th Cir. 1995).

The defendant has made no substantial showing that the wiretap application includes false information or that the false information is material. The defendant offers the July 13, 2000, purported letter of an anonymous FBI agent. The defendant's claim that "this letter reflects knowledge of the case beyond what was available in the public domain and beyond what was available to the defendants through discovery at that time" is simply incorrect. The defendant's claim that the letter "shows

an awareness of the case agent, the lead defendant, the necessity requirement for a wiretap, the existence of a number of warrant extensions, the development of the case on Maui, the investigation code name, and the mechanics of the covert investigation." The unsigned letter is dated July 13, 2000, and was apparently received by the Federal Public Defender's Office on July 18, 2000.

In fact, the Wiretap Applications, Affidavits, Orders and Extensions in Misc. No. 00-00016 HG were unsealed by the Court on the government's motion on May 8, 2000 (see Exhibit 1). Copies of the affidavits detailing the investigation were thus available to the public on or shortly after May 8, 2000. Subsequent to this, copies of these materials could be purchased at Mail Boxes, Etc., at 1050 Bishop Street, Honolulu, Hawaii, and copies were available for viewing at the DEA office (see Exhibit 2). Thus, the case agent's identity and details of the covert investigation were available to anyone through the Clerk's office in early May, 2000. Extensive press coverage also provided the names of the main defendants and the operation's code name to the general public shortly after the defendants were arrested on Maui on May 4, 2000 (see Exhibit 3).

In light of the sworn statement of Agent Rothermund and the publicity over this case, it is likely that the author of the letter is a private investigator, an employee with law

4

enforcement experience hired by a defendant or a jailhouse lawyer.[2] Mr. Peter C. Wollf, Jr., the Federal Public Defender, has advised the undersigned that he has never received any further communications from this individual. The anonymity of the author also makes it highly suspicious.

## II. Wiretap

The anonymous letter claims that Agent Rothermund lied regarding "the necessity requirement and the fact that surveillance had been tried unsuccessfully." Agent Rothermund's affidavit shows that surveillance was tried but believed to be ineffective and his affidavit in support of the application details why surveillance was not expected to be effective.

The defendant asks for a <u>Franks</u> hearing claiming that she "may be able to demonstrate other instances were (sic) Special Agent Rothermund provided misleading information." The defendant cites the pleading filed by the defense in <u>United States v. Wendy Bettis</u>, CR. No. 00-00183 DAE. Defendant fails to explain the pleading in <u>United States v. Bettis</u>, and does not advise the court that that defendant pled guilty and admitted

---

[2] Department of Justice personnel in both the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA), have conducted a formal inquiry in their respective Honolulu offices and have questioned the agents and Task Force agents who had access to the electronic surveillance listening post and the sealed Wiretap Applications and Orders. No agent in either office has admitted writing the anonymous letter.

5

under oath that she used a telephone to facilitate a distribution of marijuana.

### III. The Search Warrant Affidavit Overwhelmingly Establishes Probable Cause

While Agent Rothermund did incorrectly advise the court in his search warrant affidavit that the defendant gave a statement to Las Vegas agents that she knew she was transporting a controlled substance to Felipe Ruiz, such incorrect statement does not entitle the defendant to a Franks hearing. A hearing pursuant to Franks, requires a defendant to make a substantial showing of both an intentional or reckless false statement and that the false statement is material to a finding of probable cause. Agent Rothermund's affidavit establishes that a DEA special agent in Las Vegas incorrectly advised him that the defendant had admitted to knowingly transporting drugs for Felipe Ruiz. (See Exhibit 4). Agent Rothermund's use of this incorrect information in his search warrant affidavit was neither intentional nor reckless. Agent Rothermund's search warrant affidavit correctly reports what he had been told by a DEA agent in Las Vegas involved in the seizure of the two pounds of "ice" from the defendant's suitcase. (See Exhibit 5). A careful analysis of Agent Rothermund's search warrant affidavit reveals that deletion of the false statement does not affect the validity of the warrant since the Magistrate Judge who issued the warrant had overwhelming information that established that the defendant

6

was involved with Felipe Ruiz's drug organization. The Magistrate Judge was advised that the defendant was found in possession of two pounds of "ice" in Las Vegas on March 30, 2000. (See Exhibit 5). Additionally, the defendant was intercepted on the telephone on three occasions discussing the distributions of drugs with Ruiz. The false information contained in Agent Rothermund's search warrant affidavit was not material to the court's determination of probable cause to search the defendant's residence.

### IV. The Consensual Search of Defendant's Suitcase

The defendant was approached by two Las Vegas police officers at the McCarran International Airport on March 30, 2000. The officers identified themselves as police officers and asked to speak with the defendant and co-defendant Karla Kahau. The defendant and Kahau agreed to answer the officers questions and gave consent to search their purses, their persons and their luggage. Prior to approaching the two women, the officers had been told by another officer that a canine sniff of the women's checked luggage had resulted in a positive alert by the Las Vegas Police Department's narcotics detection dog. After receiving consent to search their luggage, the officers opened the bag the dog had alerted on and found a pink colored bundle wrapped in cellophane and dryer sheets containing approximately two pounds of crystal methamphetamine.

Government agents, without a warrant or probable cause, may conduct a search based upon an individual's voluntary consent, and any evidence discovered during the search may be seized and admitted at trial. Schneckloth v. Bustamante, 412 U.S. 218, 219 (1973).

CONCLUSION

The defendant has failed to make the substantial preliminary showing that entitles her to a hearing under Franks v. Delaware, 438 U.S. 154 (1978), to examine the wire tap application. The search warrant affidavit, absent the incorrect statement regarding the defendant's admission of knowingly transporting drugs, adequately establishes probable cause to search the defendant's residence. The search of the defendant's luggage by Las Vegas police officers was consensual. The defendant's motion to suppress should be denied.

DATED: January 31, 2001, at Honolulu, Hawaii.

Respectfully submitted,

STEVEN S. ALM
United States Attorney

By  /s/ T. Muehleck
THOMAS MUEHLECK
Assistant U.S. Attorney

8

STEVEN S. ALM
United States Attorney
District of Hawaii

THOMAS MUEHLECK
Assistant U.S. Attorney
Suite 6100, Box 50183
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone: (808) 541-2850

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 8 2000

at 4 o'clock and ___ min. ___ M.
WALTER A.Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING INTERCEPTION OF WIRE COMMUNICATIONS TO AND FROM TELEPHONES BEARING THE NUMBERS (808) 661-5391 AND (808) 268-3253, ELECTRONIC SERIAL NUMBER 23702666634 | MISC. NO. 00-00016 HG<br><br>ORDER UNSEALING APPLICATIONS, AFFIDAVITS, AND ORDERS AND AUTHORIZING THE DISCLOSURE OF MONITORED CONVERSATIONS |

ORDER UNSEALING APPLICATIONS, AFFIDAVITS AND ORDER
AND AUTHORIZING THE DISCLOSURE OF MONITORED CONVERSATIONS

Upon consideration of the government's motions (1) requesting that the Court unseal all applications, affidavits, and orders filed and issued in conjunction with the Court's order of February 8, 2000, March 9, 2000, and April 10, 2000, in the above-captioned matter and (2) requesting authorization to disclose in criminal proceedings recording tapes and transcripts generated pursuant to said orders, and good cause having been shown;

EXHIBIT 1

NOW THEREFORE IT IS HEREBY ORDERED that the Clerk of the Court shall cause to be unsealed and placed on the public record the following:

All applications for electronic surveillance, their supporting affidavits, and resulting orders filed in this matter on February 8, 2000, March 9, 2000 and April 10, 2000.

IT IS FURTHER ORDERED that the government, through its attorneys, is authorized to disclose any tape recordings and transcripts thereof or conversations monitored pursuant to the Court's referenced electronic surveillance orders in any criminal prosecution directed against or otherwise involving any of the individuals identified in any of the referenced orders authorizing electronic surveillance.

DATED: May 8 , 2000, at Honolulu, Hawaii.

SUSAN OKI MOLLWAY
UNITED STATES DISTRICT JUDGE

IN THE MATTER OF THE APPLICATION OF THE
UNITED STATES OF AMERICA FOR AN ORDER
AUTHORIZING THE INTERCEPTION OF WIRE
COMMUNICATIONS FROM TELEPHONES BEARING
THE NUMBERS (808) 661-5391 AND (808)
268-3253, ELECTRONIC SERIAL NUMBER
23702666634
MISC. NO. 00-00057 HG
ORDER UNSEALING APPLICATIONS, AFFIDAVITS,
AND ORDERS AND AUTHORIZING THE DISCLOSURE
OF MONITORED CONVERSATIONS



U.S. Department of Justice

United States Attorney
District of Hawaii

PJKK Federal Building  (808) 541-2850
300 Ala Moana Blvd., Room 6-100  FAX (808) 541-2958
Honolulu, Hawaii 96850

June 21, 2000

Richard L. Hoke, Esq.
1188 Bishop Street, Suite 907
Honolulu, HI 96813

    Re: United States v. Leah Cardenas
       Cr. No. 00-00184-02 HG

Dear Counsel:

  Pursuant to your request for discovery in the above matter and in accordance with Criminal Local Rule 16.1 of the Local Rules of Practice of the U.S. District Court for the District of Hawaii, the following information is provided. The paragraphs below track the paragraphs of CrimLR 16.1:

  1. There are numerous statements made by the defendant that were intercepted and tape recorded pursuant to a wiretap in Misc. No. 00-00016 HG. These conversations include, but are not limited to, those charged as Counts in the Indictment. Those tapes are part of approximately 600 audio cassette tapes that are held in the office of the Drug Enforcement Administration (DEA) and may be examined in Room 3-147 of the Federal Building. We will make arrangements to have the tapes copied by a contractor at your expense should you so desire. The wiretap application, orders and reports may be examined in Room 3-147 and a copy has been provided to Mail Boxes Etc. Business Center, 1050 Bishop Street (telephone 550-4656). Mail Boxes Etc. has agreed to provide copies of the documents at counsel's request. Most of the conversations on the 600 audio cassette tapes are in Spanish and we are preparing English translations which we will provide when completed. Brief summaries of the conversations may be reviewed in the DEA office and copies of those summaries may be xeroxed at your expense. Those summaries fill six banker boxes. We believe, however, that the DEA will make efforts to direct you to the days on which the defendant was intercepted, if you make an appointment with DEA SA Michael Rothermund.

  2. A sanitized copy of the DEA report of the defendant's statement is attached;



EXHIBIT 2

3. The defendant did not appear before the grand jury;

4. A copy of the defendant's criminal record will be provided;

5. A sanitized DEA report of what was taken from the defendant's vehicle is attached. Those materials and all other materials seized during the investigation of this case may be examined at the DEA office;

6. A copy of the laboratory examinations in this case will be provided when received;

7. There is no known material discoverable under Brady v. Maryland;

8. There was no photographic lineup or show up involving the defendant;

9. No search warrant was executed on the defendant's residence; and

10. As mentioned above, the defendant was intercepted on a wiretap employed during the investigation of this case. A copy of the wiretap materials is held by the DEA and may be examined in that office. A copy of the wiretap materials has been placed with Mail Boxes, Etc., 1050 Bishop Street (telephone 550-4656). They have agreed to provide counsel with a copy at your request and at your expense. Please contact the undersigned AUSA if you have any questions.

In accordance with subparagraph (b) of the Local Rules, reciprocal discovery is requested.

Very truly yours,

STEVEN S. ALM
United States Attorney
District of Hawaii

*/s/ T Muehleck*

THOMAS MUEHLECK
Assistant U.S. Attorney

Enclosures
TM:pr

# 'Operation Powerball' smashes two Maui drug rings; 51 arrested

**The leaders face 20-year mandatory terms if found guilty in the 'large-scale,' Lahaina-based operations**

**By Debra Barayuga**
*Star-Bulletin*

The arrest of 51 people has crippled two drug rings headquartered on Maui, law enforcement officials say.

U.S. Attorney Steve Alm yesterday lauded the combined efforts of federal and local law enforcement — dubbed Operation Powerball — that netted alleged kingpin Felipe Ruiz-Castro, 31.

The head of a smaller drug organization, Jorge Salazar-Guillen, 32, was arrested in early April. More arrests are pending.

"It's safe to say the Ruiz criminal organization has been dismantled by law enforcement; the Salazar operation, severely damaged," Alm said.

The two rings are believed to have been operating as early as May 1999. The investigation of these two groups began in earnest in early 2000 by the local DEA and the Maui Police Department after the key players were identified.

Mark Trouville, associate special-agent-in-charge of the Los Angeles Field Division of the DEA, said the rings are not typical heroin or cocaine organizations. "These are folks who dealt with cocaine, heroin, methamphetamine ice and marijuana and were able to provide these drugs on a large-scale basis to a lot of folks in this community."

While the arrests won't wipe out the drug problem on Maui, it will make drugs a lot less accessible, said Maui Police Chief Tom Phillips.

The number arrested is believed to be the most ever in a drug raid on Maui.

While officials declined comment on the magnitude of both operations, they characterized the groups as "large-scale."

The rings were based in Lahaina and were most active on Maui, but had a wide range of customers on Oahu, Kauai and the Big Island.

According to indictments unsealed this week, the rings obtained drugs from Arizona, Las Vegas and Mexico and brought them to Hawaii via couriers, baggage and express-mail packages. Wire transfers were made to the mainland and Mexico to hide the proceeds.

Ruiz and Salazar have been charged under federal drug kingpin statutes for continuously violating drug laws and benefiting substantially from their activities.

Both face a mandatory minimum of 20 years imprisonment without the possibility of parole if convicted. Most of the co-defendants face up to life in prison, with a mandatory minimum of 10 years.

The Ruiz organization consists of about 58 members named in the indictments. Forty-one have been arrested so far, including four in California, two on Oahu and one in Arizona. Nearly all those named in the Ruiz indictments have been charged with conspiracy to distribute and possession with intent to distribute.

**Felipe Ruiz-Castro**
31, ALLEGED DRUG KINGPIN

The La Fogata Mexican Restaurant in Lahaina, owned by Ruiz and Francisco Mora-Garcia, allegedly was used to store the drugs and served as a front for their organization.

The Salazar organization has about 20 members. About 10 from that group, including Salazar, were arrested in early April. At least three of 75 individuals indicted belong to both organizations.

While a majority of the estimated 10,000 Hispanics on Maui are hard-working, law-abiding folks, those arrested cast the rest in a bad light, Alm said. "Shame on them."

An assortment of drugs, cash, weapons and cars have been seized throughout the investigation.



**Jorge Salazar-Guillen**
32, ALLEGED HEAD OF DRUG RING

In one instance, six kilograms of cocaine were found in two wrapped gifts seized from a suitcase that were labeled "To Papa, from Susie," and "To Nana, from Kelly." The suitcase belonged to a courier who was also arrested.

"That's a lot of drugs for a small community," said Tom Senecal of the DEA's Airport Division. Inserted in the packages were scented dryer sheets, allegedly used to confuse drug-sniffing dogs.

**Cars for Catholic Charities**
Donate your car to Catholic Charities! Your gift can be used as a tax deduction. Car must be in Running condition. For more information, call **546-CARS (2277)**

EXHIBIT 3
*Dry Cleaning Sale!*
$2.50 Per garment

## AFFIDAVIT OF MICHAEL D. ROTHERMUND

I, MICHAEL D. ROTHERMUND, after being duly sworn, deposes and states as follows:

1. I have been a Special Agent of the United States Drug Enforcement Administration ("DEA"), Department of Justice, since July 1996.

2. The following is a response to an anonymous letter addressed to "Mr. Peter Wolf" dated 07/13/00, which was attached to Mr. Lowenthal's motion.

   a. In response to paragraph one of the letter: I never lied in my affidavits for the wiretaps or in any of the affidavits requesting 30-day extensions.

      1) All undercover contacts made with RUIZ during the course of this investigation never revealed any of RUIZ'S sources of supply for cocaine nor did they indicate what RUIZ did with his drug proceeds. In my experience, I also believe that it would be highly unlikely that RUIZ would allow the undercover agent into RUIZ's close circle of co-conspirators or into his close confidence so as to meet all associates and learn their roles. In my opinion a wiretap was necessary to identify all of RUIZ's associates, learn their roles, identify what he did with his drug proceeds and learn of his sources of supply. Only through a wiretap investigation could Agents develop and arrest the entire RUIZ organization.

      2) Regarding the issue of surveillance techniques utilized during the course of this investigation, I relied on the observations made by surveillance agents before and during the telephone intercept phase of this investigation. DEA 6 reports and other Law Enforcement Agency reports have documented the surveillance conducted on RUIZ and his co-conspirators. Surveillance agents told me that RUIZ and his associates often utilized counter-surveillance techniques.

      3) While surveillance agents were available for approximately 16 hours per day during the telephone intercept phase of this investigation, very seldom was surveillance maintained on one target for any long period of time. Surveillance assignments were made based on information obtained from the intercepted conversations.

Exhibit 4

Agents would mainly respond to activity derived from the interceptions. On more than one occasion, surveillance was terminated or pulled back for one or two days at a time due to activity observed by the surveillance agents/officers, which they believed indicated that the targets were looking for surveillance.

        4) During the final 30 days following the last extension, drugs were being seized and co-conspirators were still being identified.

    b. In response to paragraph two of the letter: I never lied to, or misled U.S. District Judge Helen Gillmor. I stated our observations during the investigation and our interpretation of what the investigation revealed. At no time did I make false statements to or mislead U.S. District Judge Helen Gillmor.

    c. In response to paragraph four of the letter: The majority of all defendants charged in the indictments relating to this case were overheard ordering, or discussing drugs on the telephone. Whenever it was deemed appropriate and beneficial to the investigation, the intercepted individuals were put under surveillance to corroborate the context of the intercepted conversations and to identify as yet unknown co-conspirators.

        1) The information intercepted during the Riverside, California, and Hawaii wiretap phases of the investigation was corroborated by the detention of suspect couriers and the seizure of drugs on at least seven occasions in Hawaii, Arizona, Nevada, and California.

        2) During the course of the undercover phase of the investigation, undercover conversations between the undercover agent and RUIZ, clearly revealed the use of code words or language by RUIZ and his co-conspirators. In one instance, RUIZ and the undercover agent referred to "avocados" as a code word for cocaine. In another instance RUIZ, while negotiating with the undercover agent used to the cocaine as "taquitos". Finally on one occasion during the wiretap, a customer asked RUIZ for "car parts" and went on to ask for one spark plug for $900 to $1,000. It should also be noted that common code words utilized by drug traffickers were also utilized by RUIZ and his co-conspirators during the investigation, such as "windows" and "batu" for methamphetamine, "tires" for black tar

heroin and "mota" for marijuana and "girl" and "cocoa" for cocaine.

3.  With regards to Defendant HUIHUI's motion to suppress evidence in this case based on the deliberate and reckless omission of facts that tend to mislead, I would like to clarify the reference, made by me, in my affidavit for search warrant to search Defendant HUIHUI's residence on or about May 4, 2000. S/A Chris Cadogan of the Las Vegas District Office telephonically contacted me and advised me on March 30, 2000, that Karla KAHAU and Mona HUIHUI had made statements to the Las Vegas Police against Felipe RUIZ. S/A Cadogan stated that both KAHAU and HUIHUI admitted that controlled substances were inside the luggage and that they were transporting it to RUIZ in Maui, HI. Based on this information, I included into my affidavit supporting my application for search warrant the statement that both KAHAU and HUIHUI admitted that they knew that there was controlled substances in the luggage and that they were transporting it to RUIZ in Maui, HI. S/A Cadogan's DEA 6 report concerning this misinformation is attached to my affidavit.

4.  In regard to the claim by Defendant HUIHUI that I made misleading statements in the affidavit to search Wendy BETTIS' residence, I would like to clarify the use of the words "do it". During the monitoring of the telephone calls, the contract monitors summarized the pertinent conversations and reported these statements in a written report. The monitor's reported that Wendy Bettis said she would rather meet at her place and "do it". In drafting the affidavit for search warrant, I utilized these summary reports. I did not listen to the actual telephone conversation between Wendy Bettis and Francisco Mora-Garcia on 02/15/00. I believe the monitor's report and my affidavit are not misleading in that Wendy BETTIS obviously wanted to go to her residence <u>to do something</u>. Based on the information from the investigation, I believe that what they intended to do was a drug deal.

   FURTHER AFFIANT SAYETH NAUGHT.

                                    _____
                                    MICHAEL D. ROTHERMUND
                                    Special Agent

L.S.                                                  DEA

Subscriber and sworn to before me this
2nd day of February, 2001.

*Patricia L Redondo*
Notary Public, State of Hawaii
*Patricia L. Redondo*
My commission expires: 6/3/2003