1          CASE AGENT:  After reviewing the report, Your

2    Honor, I do not recall showing the actual report and

3    saying, "Hey, read through it."  I do remember going over

4    the report and asking, you know, "Your supplier was Soto,

5    half kilo; is that correct?"  "Yes."  Stuff to that

6    effect.  I don't recall -- and I asked Special Agent Pa,

7    who was with me on the debriefings, if he recalled me ever

8    giving the report to him and doing it.  I don't recall

9    doing that, no.

10          THE COURT:  And what did Agent Pa say?

11          CASE AGENT:  He says he doesn't recall me doing

12    that as well.

13          THE COURT:  So the government's position is you

14    have -- at least -- regardless of this lack of recollection

15    on showing it to the witness, you certainly don't have a

16    signed copy; is that your position?

17          CASE AGENT:  On our reports the only -- he does

18    not sign anything.  The only time we ever do signed copies

19    would be if it's a signed statement.

20          THE COURT:  And he says he corrected something.

21          CASE AGENT:  There is an amount -- after

22    reviewing the 6 that's when I went back to my office to

23    check the dates to see if I could have prepared the report.

24    And after checking the dates I could have prepared the

25    report.  And there is one correction, but it's in my

# EXHIBIT C

1   writing.  So my recollection --

2           MR. MUEHLECK:  Your handwriting.

3           CASE AGENT:  In my handwriting.  So my

4   recollection would be, if I was given it to him to make

5   changes, that he would have wrote the change in possibly.

6           THE COURT:  Okay.  So you're saying he didn't

7   review it because the change is in your handwriting.  You

8   might have reviewed the substance of your report with him,

9   he might have told you something when you asked him to

10  confirm a certain thing, he changed the amount from what

11  you were asking him to confirm, then you wrote in the new

12  amount?  Is that what you think might have happened?

13          CASE AGENT:  Yes.  On one occasion I did notice

14  that change in the report.  And I'm not saying he did

15  not -- hundred percent did not review this or did not look

16  at it.  I do not recall that, honestly.

17          THE COURT:  Okay.  Well, Mr. Muehleck?

18          MR. MUEHLECK:  Bring the witness in and show him

19  the report and ask him.

20          THE COURT:  Yeah.

21          MR. MUEHLECK:  Same way with the debriefing

22  letter, if we can -- that's in another file, Judge.

23          THE COURT:  Well, let's just wait until we get

24  all the documents before we bring him up.

25              Any other proposals, Mr. Ross?

 1            MR. ROSS:  I think Mr. Rothermund said he went

 2    over this thing with him.  I wonder if we can see that, if

 3    we don't have the signed one.

 4            MR. MUEHLECK:  I'd like Agent Rothermund to tell

 5    us how he went over this because my understanding of Jencks

 6    is, unless he reads it to him verbatim and he affirms it or

 7    denies it or accepts it or changes it, it ain't Jencks.

 8    That's my understanding of the law.

 9            THE COURT:  I think that's true.  It has to be an

10    affirmative adoption.

11            MR. MUEHLECK:  I'll let Agent Rothermund explain

12    how it was reviewed, the contents of it, if it was verbatim

13    or just a subject was asked.

14            MR. ROSS:  Well, I only went by what the witness

15    said so far.  Whether he's confused or not, I don't know.

16            THE COURT:  The witness testified that he

17    reviewed something, made corrections, and signed it, which

18    is somewhat confusing, which I don't blame Mr. Ross for

19    probing.

20            MR. MUEHLECK:  No, neither do I.

21            THE COURT:  But before I show you this report

22    more than Agent Rothermund I really think I would like to

23    hear from the witness.

24            MR. MUEHLECK:  We agree.

25            THE COURT:  You know, because, if there's a

1    conflict, well, it's a different issue no matter what Agent

2    Rothermund says.  So I sure wish we could get Mr. Seitz on

3    the line here.

4            I highly doubt that this witness signed something

5    without his lawyer being present; so, you know, if we're

6    talking about signing something, which is what he testified

7    to --

8            MR. MUEHLECK:  They don't sign debriefing

9    reports, and he did not give a signed statement at the time

10   of his arrest.  This is news to me.  I didn't remember the

11   proffer letter until Miss Sheehan told me, but we give

12   routinely a letter before we have an agent interview a

13   defendant that agree that the statements won't be used

14   against him except in cross-examination.

15           THE COURT:  So we have all seen this form.

16           MR. MUEHLECK:  It's our standard proffer letter.

17           THE COURT:  Let's see what's going on.  It

18   sounded like he meant something other than that.

19           Okay.  We'll go off the record and wait.

20       (Discussion off the record.)

21           THE COURT:  We're back on the record.

22           MR. MUEHLECK:  Go ahead.

23           MS. SHEEHAN:  We didn't find the signed copy.  My

24   guess is that, as it frequently happens, the defense

25   attorney -- we never got our signed copy back.  I, however,

1    was the one who apparently typed it because it was on my

2    computer; so what I did was I printed out copies of what

3    was sent to Mr. -- or given to Mr. Seitz via fax on

4    February 12, 2001.  And it's my belief it is the proffer

5    letter.  So I brought an unsigned copy.  I believe it

6    represents -- it's pretty standard language.  I believe it

7    represents what we gave to Mr. Felipe Ruiz-Castro.

8              THE COURT:  Can you show that to defense counsel.

9              MS. SHEEHAN:  I brought copies for everybody.

10             MR. MUEHLECK:  The reason I think this is the one

11   is Mr. Ruiz was originally represented by Sam King, Jr.,

12   and there was no movement in the case.  He was never

13   debriefed or anything.  When Mr. Seitz was -- when Mr. King

14   got out and Mr. Seitz was appointed, Mr. Seitz met with us

15   and said, "Can we resolve this.  Can we do a debriefing.

16   Can we try to resolve this."  And that's the only

17   debriefing letter that was ever prepared.  We never

18   prepared one for Sam King, Jr.

19             THE COURT:  Can the courtroom deputy call

20   downstairs to the Marshal's Office to bring up the witness.

21             MR. MUEHLECK:  And I have found two letters, and

22   one I recall was previously given to --

23             MS. SHEEHAN:  Mr. King.

24             MR. MUEHLECK:  Yes.  Was sent to Mr. King.  It is

25   a letter that Mr. Ruiz sent to the DEA concerning his

1    forfeiture.  And then there's a letter he sent to the FBI

2    concerning the anonymous FBI agent letter to Judge Gillmor.

3    And I'm going to give that copy out.

4            The one I recall -- the DEA letter concerning his

5    Toyota pickup where he basically says why is my family

6    being persecuted by taking my car when I'm the guilty

7    person, I had given this in Jencks to -- or in Jencks to an

8    earlier trial.  I think in the -- I gave it to Mr.

9    Partington when we did three or four before Your Honor.  I

10   don't know if it went out to these gentlemen or not in this

11   case, but in any case there it is, copies of each.

12           THE COURT:  Can the courtroom deputy have the

13   witness brought up.

14           THE CLERK:  They called.

15           THE COURT:  They called.  Okay.

16       (Witness enters.)

17           THE COURT:  Can you come back up to the witness

18   stand, please.

19       (Witness resumes the witness stand.)

20           THE COURT:  Mr. Muehleck, you may proceed.

21           MR. MUEHLECK:  I'm going to mark this as 78,

22   Judge.

23           THE COURT:  All right.  And "this" meaning that's

24   the proffer letter?

25           MR. MUEHLECK:  This is the three-page -- yes.

1          THE COURT:  Okay.  The date of that is what?

2          MR. MUEHLECK:  The date of that is February 12,

3   2001, if the court wishes to see it.

4          THE COURT:  Okay.

5          So the witness is being shown what has been

6   marked as exhibit 78.

7          MR. MUEHLECK:  Right.

8          THE COURT:  Go ahead, Mr. Muehleck.

9   BY MR. MUEHLECK:

10  Q    Have you seen that before?  Is that a document you've

11  discussed or a document you've testified to today, Mr.

12  Ruiz?

13  A    Yes, sir.

14  Q    Is that one of the documents you're referring to that

15  you signed?

16  A    Yes.

17  Q    All right.  Now, do you know what that is called, that

18  document?

19  A    No.  Right here and now, yeah.

20  Q    What is it called?  What do you believe it's called

21  now after looking at it?

22  A    Not sure.  Proffer letter?

23  Q    Proffer letter?

24  A    Proffer letter.

25  Q    Is there some other document you believe you've

1    signed?

2    A    Yes.

3    Q    And you're talking about DEA reports or summary or

4    what; do you know?

5    A    This letter, that's the one I signed.

6    Q    Is there some other document you were asked to review

7    or make corrections on; is that what your testimony was

8    today?

9    A    Yes, I did.

10    Q    And what was that?

11    A    That was the summary of my statements.

12          MR. MUEHLECK:   I've marked 79, a debriefing

13    report, which is the only one I'm aware of, Judge,

14    completed by Agent Rothermund.

15          THE COURT:   Okay.

16    BY MR. MUEHLECK:

17    Q    Take a look at that, please.  Flip through it.   Go

18    ahead.

19    A    (Witness complying.)

20    Q    Okay.  Have you looked at that?

21    A    Yes, sir.

22    Q    Have you seen that before?

23    A    Yes.

24    Q    Who showed it to you?

25    A    Mr. Rothermund.

1    Q    When was that; do you recall?

2    A    2 -- February 23d?

3    Q    I don't know.  I'm just asking.

4    A    Yeah, that was in February 2001.

5    Q    Did you read the entire thing and make corrections or

6    what?

7    A    Yes.

8            MR. MUEHLECK:  Okay.  That answers the questions,

9    Judge.  I'm not aware of that.

10           THE COURT:  Well, I'm going to let --

11           MR. MUEHLECK:  They should have a copy.

12           THE COURT:  Yes, they should.

13           MR. BROWER:  Your Honor, I would make a motion to

14   dismiss the charges with prejudice for failure to provide

15   Jencks material.

16           THE COURT:  Well, hold on.  Why don't you take a

17   look at this document first, and then we'll see that.

18           I'm going to have the courtroom deputy go ahead

19   and make copies.  And then I'll give defense counsel an

20   opportunity to review it.  And, certainly, Mr. Fujioka and

21   Mr. Brower, you also can reopen your cross-examination.

22           And, Mr. Brower, I'll be happy to listen to your

23   argument, but I think you should first look at it, we

24   should all look at it, and then we'll figure out where to

25   go.

1              So we'll go off the record again.

2         (Discussion off the record.)

3              THE COURT:  Let me suggest that we go ahead and

4    excuse the jury for lunch and have them come back.  If they

5    come back at 1:15, then I can see counsel at 1:00.  That

6    seems to me to make sense.

7              MR. ROSS:  1:15, Judge?

8              MR. MUEHLECK:  No, we come back at 1:00.

9              THE COURT:  You come back at 1:00.  The jury

10   comes back at 1:15.  So let me ask my law clerk if he

11   can -- since our courtroom deputy -- okay.  We'll go off

12   the record.

13        (Discussion off the record.)

14             THE COURT:  All rise for the jury.

15             We are going to recess for lunch.  I'm sorry to

16   keep you all waiting.  We have some lengthy things to take

17   care of.  I'm very sorry to have kept you waiting.  We're

18   going to take a recess for lunch, without making you folks

19   wait.  If you can be ready to come back here, we'll start

20   at 1:15.  Thank you very much.

21        (Jury excused.)

22             THE COURT:  Okay.  The witness can step down.

23        (Witness excused.)

24             THE COURT:  Counsel, I'll see you back here at

25   1:00.  Can you just wait for your copies of the exhibit,

1    but I'll see counsel back here at 1:00.

2          (Court recessed at 11:50 A.M., until 1:00 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    FRIDAY, NOVEMBER 16, 2001                1:10 O'CLOCK P.M.

2         (In open court without the jury:)

3              THE COURT:  Okay.  You can be seated.

4              We're resuming this matter to discuss the DEA

5    report, which all defense counsel have had a chance to

6    review; so I'm happy to hear from them.  I'll say this

7    first:  that this DEA report is deemed by me to be a

8    statement by the witness, Mr. Ruiz.  He testified he

9    reviewed it.  He said he corrected it.  He even said he

10   signed it; although, no one here has seen a signed copy.

11   But in any event he could definitely be said to have

12   adopted the corrected version of the report so that I do

13   consider this to be a statement producible under Jencks.

14              The record here is that actually the defendants

15   had before trial requested Jencks Act material.  The

16   government was not required to produce it until after Mr.

17   Ruiz had completed his direct exam, but it was not produced

18   at the completion of the direct examination of Mr. Ruiz,

19   and so there is a clear violation of the Jencks Act.

20              MS. SHEEHAN:  May I be heard on that issue, Your

21   Honor, on the clear violation?

22              THE COURT:  Well, hold on.

23              MS. SHEEHAN:  Yes, Your Honor.

24              THE COURT:  I recognize that the defendants don't

25   need to show prejudice to establish a violation of the

1    Jencks Act, but what sanction there is may well turn on

2    whether they can show prejudice.

3            So -- all right.  The government is contesting

4    that there has been a violation?

5            MS. SHEEHAN:  Yes, Your Honor, we do.

6            THE COURT:  Are you contesting that this is a

7    statement producible under Jencks?

8            MS. SHEEHAN:  No, Your Honor, we don't.

9            THE COURT:  Well, it wasn't produced until after

10   he had -- until a minute before lunch.

11           MS. SHEEHAN:  That's correct, Your Honor.

12           We don't favor this argument because it was never

13   our intention to have trial run this way, it was never our

14   intention to have discovery run this way, and this was

15   completely inadvertent.  So it's not an argument that we

16   favor.

17           Over the lunch hour I did, however, get to do a

18   little research, and I came across a case that I would like

19   to provide to the court.  And I'd also like to provide to

20   the court and to file in open court my memorandum in

21   opposition to the motion to dismiss.  The name of the case

22   is United States versus Hannah.  The citation is 55 F.3d

23   1546.

24           And in that case the Ninth Circuit points out

25   that production of statements covered by the Jencks Act is

1    not, in fact, automatic and that the burden rests upon the
2    defendant to invoke the statute at the appropriate time.
3              THE COURT:  This I'm aware of.  However, in this
4    case what happened, as I understood it, was that the
5    defendants actually had requested it, and I thought that
6    they were relying on the government's statement that there
7    wasn't any.  And then, when the government didn't produce
8    any after the direct, I think they were entitled to rely on
9    that since they had --
10             MS. SHEEHAN:  That's what happened in the Hannah
11   case, Your Honor, where a request was made for production
12   of Jencks material that was made pretrial, and that's where
13   it ended.  When the witness -- after the witness testified
14   and after they were done on direct there was no request
15   for -- tendered to the court for production of Jencks
16   material.  The Ninth Circuit, based upon the fact that
17   there had been no in-court request, until Mr. Ross did it
18   in this case, because there had been no in-court request
19   the Ninth Circuit found no violation of the Jencks Act.
20   The Ninth Circuit placed the responsibility squarely upon
21   defense counsel.
22             THE COURT:  I will say this:  that I was
23   surprised that, when Mr. Fujioka elicited this testimony,
24   that he proceeded with his cross-examination, completed his
25   cross-examination, and then sat down.  So I understand the

1    argument that could be made that he waived his right to

2    Jencks Act material.

3            I think the argument is even a stronger one of

4    waiver with Mr. Brower because Mr. Brower may well lack

5    standing to even bring the motion that he's raised orally

6    since Mr. Brower had no illusion about whether there was

7    evidence of a statement even before Mr. Brower began his

8    cross-examination, and yet he was silent until after he had

9    completed his cross-examination and Mr. Ross raised the

10   issue.  So I fully understand the waiver argument.

11           MS. SHEEHAN:  That's precisely the point that the

12   Ninth Circuit made:  that the responsibility for fairly

13   directing the attention of the court to the precise demand

14   submitted for the court's determination is appropriately

15   placed upon the defendant, who seeks the statute's

16   benefits.

17           So we do stand -- again we don't favor this

18   argument because it was -- and I think in fairness to Mr.

19   Fujioka and Mr. Brower and to the court and to the

20   prosecution it was a little unclear.  I mean it was unclear

21   to all of us until we had to have a hearing about exactly

22   what was going on, what was signed, what he thought he had

23   read.  Clearly, there was some misunderstandings.  And to

24   Mr. Ross' credit he was the one who said let's clear this

25   up right now.

1          But the point is this:  under the case law and

2    under the statute that is the defendant's responsibility.

3    Mr. Ross to his credit did it, and then we immediately had

4    a hearing and materials were immediately produced.

5          That's only the first issue, and I don't know if

6    the court wants me to address the second issue of

7    sanctions.

8          THE COURT:  Not right now.

9          MS. SHEEHAN:  Shall I file my memo?  I do have a

10   little memo.  It's only a lunchtime memo.  May I?

11         THE COURT:  Yes.  You can go ahead and file it.

12         MR. ROSS:  May I be heard, Your Honor.

13         THE COURT:  Wait a minute.  I know everybody is

14   really hot to trot here, but wait a minute.  Don't you want

15   to see this thing first so you can address everything at

16   once?

17         MR. ROSS:  Sure.

18         THE COURT:  So wait.  Wait a second.

19       (Pause in proceedings.)

20         MS. SHEEHAN:  Would the court like my copy of

21   Hannah, Your Honor?

22         THE COURT:  No.  That's all right.  Thank you.

23         Okay.  Well, I think that everybody might be able

24   to argue more effectively if I give you my thoughts on

25   this, and then I'll hear from everybody who wants to be

1    heard on it.

2            But it does seem to me -- I'm well aware of this

3    waiver argument, but it does seem to me that the defense

4    should have received this Jencks statement upon -- at least

5    upon Mr. Ruiz's completion of his direct exam.  And so I

6    would like to look at whether indeed -- I realize the

7    government is arguing that there was not a clear

8    violation.  I don't think that, even if there was a

9    violation, that the panoply of sanctions that become

10   available to the court really should be imposed.  And I say

11   that for these reasons.  At worst it seems to me that there

12   may have been some negligence involved.  I don't know that

13   there was, but there may have been by law enforcement

14   agents.

15           Apparently, the prosecutor did not know that this

16   witness had been shown this DEA statement and so was not

17   deliberately withholding the production of it.  This is a

18   lot different from situations in which there has been

19   deliberate withholding or where even statements have been

20   destroyed or notes have been destroyed, which has sometimes

21   happened.  I look also to the issue of the injury to the

22   defendant, and it's hard for me to really see any injury.

23           That's just my inclination, but I'll be happy to

24   hear from the attorneys.  For one thing the witness is

25   still on the stand.  The other thing is that the

1    witness' -- the information in the witness' statement is

2    not all that the defense had.  For some time before the

3    trial the defense had available to it the tapes, which are

4    the primary evidence here in issue.  And those are separate

5    from whether or not Mr. Ruiz really did provide a statement

6    to the government in the form of this DEA report.

7         Now, you've heard me say that I'm concerned that

8    there was a waiver.  But notwithstanding that it seems to

9    me that there is really little prejudice to anyone in my

10    letting Mr. Fujioka and Mr. Brower reopen their cross so

11    that there would be no injury to their clients.  Mr. Ross'

12    client has not been injured at all since Mr. Ross has not

13    even begun his cross-examination.

14         Now, I know that Mr. Brower wants this case

15    dismissed.  Even had there been no waiver issue I would

16    deny that motion under the circumstances of no deliberate

17    wrongdoing by the government and no injury that so far I've

18    been able to identify.

19         In the normal course a new trial is required only

20    if a Jencks violation has affected substantial rights of

21    the defendants.  And, unless the defendants can identify

22    some substantial right of theirs that has been affected, I

23    don't think a new trial, which is among the remedies

24    available for a Jencks Act violation, is warranted.

25         From what I can tell the Ninth Circuit's most

1    recent pronouncement on this kind of a situation is United

2    States versus Riley at 189 F.3d 802, decided in 1999.    And

3    in that case the district court had declined to strike

4    testimony.    The Ninth Circuit reversed, saying it could not

5    find the Jencks violation to constitute harmless error.

6    But here I think that's what it is.    If there was an error,

7    it was harmless.

8             So I'll be happy to hear now from counsel.    Who

9    wants to go first?

10             MR. ROSS:    Mr. Brower.

11             THE COURT:    Okay.    Mr. Brower, go ahead.

12             MR. BROWER:    Your Honor, under 18, United States

13    Code, Section 3500, it is very clear that Congress mandated

14    that the government turn over to the defense statements

15    after the direct examination.

16             THE COURT:    Okay.    Now, I've read that particular

17    statutory language, and I know it sounds -- as the Ninth

18    Circuit has said, it has a mandatory ring.    Nevertheless,

19    the Ninth Circuit has said district court's have discretion

20    on whether to impose sanctions or to refuse to impose

21    sanctions if they find noncompliance with the Jencks Act.

22             MR. BROWER:    And, Your Honor, with regard to the

23    Jencks material Mr. Muehleck had filed on November 17th,

24    2000, a statement in this case -- it was a memorandum,

25    essentially -- regarding early disclosure of witness in

1    which he said United States also agrees to provide its

2    Jencks material on the Wednesday before the trial starts.

3    The court should understand also that the United States has

4    already provided discovery to defense according to Rule

5    16.

6              Okay.  Now, after this we had a pretrial at some

7    point with Judge Kurren.  Judge Kurren issued an order,

8    saying provide the material I believe it was the Friday

9    before trial pursuant to what the prosecution was

10   representing they were going to do.  Prosecution then filed

11   a request to amend the order, saying "We simply volunteered

12   that.  We shouldn't be bound by it."  And so the order was

13   amended.  And Judge Kurren said, "Okay.  They don't have to

14   provide it by Friday, but they've got to provide it at the

15   trial."

16             THE COURT:  That's not what happened.  I happen

17   to be pretty familiar with what's happened on this

18   particular subject, which is the subject in many other

19   cases, and I know that that is not what happened.  Mr.

20   Muehleck may well have taken the position a year ago that

21   he would voluntarily produce the Jencks material.

22   Thereafter at the pretrial conference they took the

23   position, no, we're going to stand on our right not to have

24   to produce it until after direct exam of each witness.

25   There was a mistake in the pretrial order when it said the

1    government had agreed to produce it.  That did not reflect

2    what had actually been the government's position at the

3    pretrial conference.  And it was for that reason that Judge

4    Kurren corrected the order.  And I know this because I

5    spoke to Judge Kurren about it myself before that

6    correction took effect so that what you have represented is

7    absolutely not what occurred.

8         MR. BROWER:  Well, Judge, I didn't represent

9    anything inaccurate.  The order said they would produce it

10   at trial from what I'm understanding.  I didn't say exactly

11   when at trial, but I'm not -- I don't think I

12   misrepresented.

13        THE COURT:  I think you said they changed their

14   position and so then he changed the order.  That is not

15   what happened.

16        MR. BROWER:  Well, you know --

17        THE COURT:  Hold on.  The order was an order that

18   resulted from a pretrial conference.  The order has to

19   reflect what actually occurred at the conference.  It did

20   not.  And because it did not correctly reflect what

21   happened he changed the order.

22        MR. BROWER:  Now, you know, I think it's

23   ridiculous to say that the defense has to assume that the

24   government, you know, has something when the defense is

25   being told that the government doesn't have it.

1           I also wrote a letter recently to Judge Kurren

2     with a carbon copy to Mr. Muehleck and all defense counsel

3     and asked again, you know, "We don't have the materials.

4     Can we get it," blah, blah, blah.  And, as late as last

5     night, Mr. Ross had asked Mr. Muehleck -- and I was there,

6     and he'll confirm it -- whether there's any statements on

7     this witness.  Mr. Muehleck said words to the effect, you

8     know, "I don't do that."

9           So that was another situation where they were

10    being requested to give us the materials.  We weren't given

11    the materials.  It's not incumbent upon the defense to try

12    and figure out whether or not, you know, there is something

13    and we're not being told about it.  That's my point.

14          THE COURT:  But it must have become incumbent

15    upon you before you began your cross because you sat here,

16    I sat here, and we heard Mr. Ruiz say that he had signed a

17    debriefing statement.  So --

18          MR. BROWER:  Well, Your Honor --

19          THE COURT:  And you did nothing.

20          MR. BROWER:  Your Honor, I would agree with Miss

21    Sheehan that we were all somewhat confused as to exactly

22    what transpired.  In fact, that's why the court had him go

23    up on the stand.  So there wasn't -- it wasn't real clear

24    that there was something that he had affirmed as being his

25    statement.

```
 1              THE COURT:  But you didn't ask.  I mean it
 2    seems -- I agree with you it wasn't really clear, and yet
 3    you're standing here purporting to be very wronged, and you
 4    didn't do anything about it.  You didn't want to clarify
 5    it.
 6              MR. BROWER:  Well, Your Honor, the whole thing
 7    was going on.  We were trying to find out what exactly he
 8    did.  It wasn't clarified until actually Mr. Muehleck went
 9    and got some materials, came back, and the witness was
10    asked questions and then it was confirmed.
11              So I mean it was not real clear, and I don't
12    think the court should say that I waived anything because I
13    wasn't clear about it.
14              THE COURT:  I think you did waive.  But I think
15    despite that waiver you're not going to harm your client
16    because I'm not going to let you harm your client, and I'm
17    probably going to let you reopen.  But I think that it is
18    very odd that you sat there, began, proceeded through, and
19    completed your cross-examination.  So, presumably, had Mr.
20    Ross not spoken, this issue would never have been
21    clarified.
22              MR. BROWER:  And the other thing -- the point is,
23    Your Honor, that I think that, if the court is going to
24    make some kind of finding with regard to inadvertence
25    versus intentional, then we should have an evidentiary
```

1    hearing as to whether or not the agents actually knew about

2    it.  We've had Mr. Rothermund represent not under oath the

3    two agents forgot about it.

4              THE COURT:  He didn't say they forgot about it.

5              MR. BROWER:  Well, he said that he didn't

6    remember and the other agent didn't remember whether or not

7    the witness had reviewed it and affirmed it as his

8    statement.  So, if the court is going to make a finding, we

9    should be entitled to an evidentiary hearing with witnesses

10   under oath on that because the statement itself also was

11   provided -- because it's written right on the statement --

12   to the prosecutor; so, you know, and it came from Mr.

13   Muehleck's office.

14             THE COURT:  The DEA report was clearly provided

15   to the prosecutor.  I think what the prosecutor didn't know

16   was that this DEA report, which Mr. Muehleck definitely

17   had, had been shown to, corrected by, and affirmed by Mr.

18   Ruiz.  And that isn't shown by anything on the report.

19             MR. BROWER:  Well, again I think we should have

20   an evidentiary hearing on that.

21             With regard to the prejudice --

22             THE COURT:  What for?  Tell me what prejudice

23   you've suffered.  Even assuming that law enforcement here

24   deliberately withheld information that would have resulted

25   in Mr. Muehleck's producing this earlier, even assuming

1    that I would like to know what, if any, prejudice you

2    suffered because you do not need to show prejudice to

3    establish that the Jencks Act has indeed been violated.

4    But you do have to show me some prejudice to warrant any

5    kind of sanction, assuming there is such a violation.  So

6    tell me what's the prejudice that would be -- has been

7    visited upon Tomas Marino, Jr., especially if I let you

8    reopen your cross.

9         MR. BROWER:  Well, the prejudice, number one, is

10   that we've completed our cross-examination and that --

11        THE COURT:  Yeah, but I'm going to let you

12   reopen; so what's the prejudice?

13        MR. BROWER:  The statement that was made by -- in

14   his statement was that A. Marino, T. Marino, Jr., picked up

15   cocaine from Thomas Marino.  That contradicts exactly what

16   he said on the witness stand.

17        THE COURT:  Assuming that's so, I'll let you

18   cross-examine him on that.  I mean Mr. Ross hasn't even

19   begun; so for your client's purposes you can just keep

20   continuing on with your cross-examination.  What's the

21   prejudice?

22        MR. BROWER:  He also indicated that he was aware

23   that Tomas Marino, Jr., used cocaine.  He testified that he

24   didn't really know much about Tomas Marino, Jr.  So the

25   prejudice is that the jury should be entitled to know that

1    information and I should be entitled to ask about it when

2    I'm up on cross-examination.

3         THE COURT:  So I'm going to let you do that; so

4    what's the prejudice if I let you do all of that?

5         MR. BROWER:  I think it's prejudicial to have to

6    go back up there after, you know, they've been mulling over

7    the evidence that went in on this witness.

8         THE COURT:  But in your case there's nothing in

9    between.  I mean there's nothing in between.  In other

10   words, there's been no other issue.  What's so terrible?

11   It's as if we had a long lunch break, and you came back --

12        MR. BROWER:  Because the whole point is this,

13   Your Honor, why have the rule?  If you can open up the

14   cross, why have the Jencks Act rule at all?  They say

15   produce it after direct examination, not hide it and then,

16   if somebody finds out, give it to them after

17   cross-examination.  What's the point of having the rule if

18   it's not going to be enforced?

19        THE COURT:  What's the point of having a sanction

20   like a new trial or something if you can remedy it right

21   now?

22        MR. BROWER:  Your Honor, I'm not looking for a

23   new trial.  I'm looking for dismissal with prejudice.

24        THE COURT:  What's the prejudice to your client?

25   So far you've told me I ought to be able to do A, B, and

1    C.  And I'm saying, "Okay.  I'll let you do A, B, and C."

2    So what else is it --

3             MR. BROWER:  The prejudice is the Congress

4    indicated that the defense should have this material before

5    they begin their cross-examination, not after they close

6    it.

7             THE COURT:  That's not prejudice.  You're telling

8    me what the statute says.  That's not prejudice.

9             MR. BROWER:  I think it's prejudicial because the

10   jury's already looked at the direct, they've looked at the

11   cross-examination.  Now all of a sudden things are going to

12   open up, and they're going to be thinking what's going on

13   here?  Why is this?  Hey, what's happening?  Now the guy's

14   saying this.  I mean it's just -- it's going to be very

15   confusing for them.

16            THE COURT:  Okay.  Any other defense counsel want

17   to be heard?

18            MR. ROSS:  I would like to say something, Your

19   Honor, on this.  These cases that we've been talking about,

20   U.S.A. v. McCoy and cases like that, say that the sanctions

21   should be applied when there's a deliberate violation of

22   the act.  Now, that's the question, I think, that's

23   involved.

24            THE COURT:  Not just if there's a deliberate

25   violation.  Okay.  So let's look at the sanction of

1    striking a witness' testimony, which would be a severe

2    sanction in this case since I think the government really

3    has to rely on Mr. Ruiz.  According to the Ninth Circuit,

4    if I were to strike testimony, that is a decision I should

5    make looking at consideration of the government's

6    culpability and the injury resulting to the defendants.

7    That's why, when I spoke to Mr. Brower, I said I don't --

8    personally, I don't think that there is any indication of

9    deliberate wrongdoing, but, even if there were, you still

10   need to show me injury.

11        MR. ROSS:  Let me just say this.  When Ruiz

12   concluded his direct yesterday, there was no mention of

13   this signing any papers.  It first came out yesterday when

14   Mr. Fujioka asked him what took place and he said, "I did

15   this debriefing, and I believe I may have signed

16   something."

17        THE COURT:  Yes.

18        MR. ROSS:  He didn't pay attention to that at

19   that point and he kept going.  On the way out of here last

20   night I asked Mr. Marino -- excuse me.  Mr. Muehleck.

21        MR. MUEHLECK:  Mr. Muehleck, Mr. Ross.

22        MR. ROSS:  Okay.  I'm sorry.  Whether he had such

23   a statement.  I put him on notice.  He said, "Don't be

24   silly, sir.  We don't do stuff like that."  I put him on

25   notice that I'm looking for something like that, though,

1   whether it's absurd or not.

2          He didn't bother.  He came in today, not knowing

3   what the full story.  None of us did.  And this guy wasn't

4   that clear, meaning Ruiz.  So Fujioka kept going.  And he

5   walked over to me and he says, "Art, will you do me a favor

6   and see if we can press that thing because you haven't gone

7   yet."  So that's why I made the demand on you.

8          These people have some prejudice in here, and

9   I'll tell you why.  I've read this thing now.  He has a lot

10  of thoughts that he put down in here that we could have

11  explored, and those -- I know you're going to allow us as

12  some kind of remedy to go over again, but he put down

13  statements that we could have explored.  We didn't have

14  advantage of talking to him on cross-examination yet.

15         THE COURT:  Okay.  But now in your case you

16  haven't even begun cross; so you will certainly be able to

17  put together a cross with this statement in mind.  And, if

18  you need more time, we'll recess for the day, whatever time

19  you need.  I mean I'm willing to give you that.

20         But in your case it's a little hard for me to see

21  the prejudice since, if they were a one-defendant case,

22  this is exactly when you would have gotten it.

23         MR. ROSS:  But I depend on their

24  cross-examination to help me, too.  I'm not here alone.

25  I've got two other guys that are doing a good job on trying

1    to impeach this man.  I have to depend on that, too.  I get

2    the benefit.  And, if they don't have the deck of cards to

3    play with, that's not fair to all of us at one time.  And

4    they haven't had their day in court properly because they

5    were denied this document.  That's what I'm saying.

6              THE COURT:  Okay.  Anybody else want to be

7    heard?  No?

8              MR. MUEHLECK:  Yes.

9              MS. SHEEHAN:  From the government, Your Honor.

10             THE COURT:  You do?

11             MS. SHEEHAN:  Yes, I do, Your Honor, please.

12             THE COURT:  Don't lose your case now because

13   you're actually -- you're ahead, and, you know, it's my

14   experience sometimes people can convince me away from their

15   positions.

16             MS. SHEEHAN:  As Judge Gillmor says, never

17   snatch -- I'll mix it up.

18             THE COURT:  Snatching defeat from the jaws of

19   victory is what you're doing?  You might do that.

20             MS. SHEEHAN:  No, Your Honor.  I simply wanted

21   to -- on the issue of no bad faith on the part of the

22   government I did want to simply move into evidence an

23   exhibit, and that is the Giglio letter that was sent out to

24   defense counsel in advance because, obviously, the ability

25   to cross-examine is one of the factors.